*595 DE MUNIZ, C. J.
These three cases, which we have consolidated for purposes of argument and opinion, involve one administrative rule challenge (ORS 183.400) and two mandamus actions (ORS 34.110) brought by two prison inmates, each convicted of aggravated murder that he .committed when he was less than 17 years of age.[1]
In the rule challenge brought by petitioner Sopher, he contends that the board exceeded its statutory authority when it promulgated administrative rules (the juvenile aggravated murder, or JAM, rules) that provide for a parole review hearing (rather than a parole hearing for the purpose of setting an initial parole release date) after no fewer than 20 years of incarceration, at which time a person convicted of juvenile aggravated murder may attempt to establish his or her suitability for eventual parole. In Sopher’s rule challenge case, the Court of Appeals concluded that the board did not exceed its statutory authority in promulgating those rules, because ORS 144.110(2)(b) and ORS 163.105(2) to (4)[2] require the intermediate process established in the JAM rules. Sopher v. Board of Parole, 233 Or App 178, 225 P3d 836 (2010) (Sopher II).
In the two mandamus cases, relators Engweiler and Sopher each contend that the board was required under ORS 144.120(1) (1989) and ORS 144.120(1) (1991), respectively, to conduct a parole hearing and set an initial parole release date for each of them. In each case, the Court of Appeals held, among other things, that ORS 144.110(2)(b) and ORS 163.105(2) to (4) obviate any requirement in ORS 144.120(1) (1989) or ORS 144.120(1) (1991) that the board conduct such a hearing or set an initial release date for juvenile aggravated murderers. State ex rel Engweiler v. Powers, 232 Or App 214, 221 P3d 818 (2009) (Engweiler VI)[3] State ex rel *596 Sopher v. Washington, 233 Or App 228, 225 P3d 142 (2010) (Sopher III).
The common denominator in the three cases is the applicability to juvenile aggravated murderers of ORS 144.110(2)(b) and ORS 163.105(2) to (4). For the reasons set forth below, we conclude that ORS 144.110(2)(b) and ORS 163.105(2) to (4) do not apply to juvenile aggravated murderers. For that reason and others explained below, we also conclude that the board exceeded its statutory authority when it promulgated rules requiring juvenile aggravated murderers to undergo the intermediate review process described in ORS 163.105(2) to (4) before the board makes parole release decisions regarding them. Finally, we conclude that the legislature provided the board with authority in ORS 144.120(1) (1989) and ORS 144.120(1) (1991) to determine initial release on parole for inmates like these who are serving an indeterminate sentence of life imprisonment with the possibility of parole. We also conclude that ORS 144.120(1) (1989) imposed on the board a legal duty to conduct a parole hearing for Engweiler to set an initial release date for him or explain why it chooses not to do so. As to Sopher, we hold that ORS 144.120(1) (1999) entitles him to a hearing at some point to set an initial parole release date, but that the board has no present legal duty to conduct such a hearing and, therefore, Sopher does not have a remedy in mandamus. We therefore reverse the Court of Appeals decision in Engweiler VI, reverse the Court of Appeals decision in Sopher II, and affirm *597 in part and vacate in part the Court of Appeals decision in Sopher III.[4]
I. BACKGROUND
We briefly summarize the factual and procedural background of each of the petitioners’ cases. Engweiler committed aggravated murder in 1990, when he was 15 years old. He was tried as an adult, and, on his conviction, the trial court imposed a life sentence with a 30-year mandatory minimum term of imprisonment under ORS 163.105(1)(c) (1989). Engweiler appealed, arguing, among other things, that the sentence that the trial court imposed was unlawful, because ORS 161.620 (1989) prohibited trial courts from imposing a mandatory minimum sentence on any person who was remanded from the juvenile court and was under 17 years of age at the time that he committed the crime for which he was remanded. The Court of Appeals agreed with that argument and vacated the sentence. State v. Engweiler, 118 Or App 132, 136, 846 P2d 1163, rev den, 317 Or 486 (1993) (Engweiler I). In 1994, Engweiler was resentenced to life in prison.
Sopher committed aggravated murder in 1992, when he was 16 years old. He, too, was remanded from the juvenile court and tried as an adult. Upon his aggravated *598 murder conviction, the trial court imposed a sentence of life in prison.
In State ex rel Engweiler v. Cook, 340 Or 373, 380-81, 133 P3d 904 (2006) (Engweiler IV), this court explained that, at the time Engweiler committed his crime, a sentence of life in prison was:
“an indeterminate sentence [which] state[s] only a maximmn term to be served under the jurisdiction of the Department of Corrections. Such a sentence did not establish the length of time that a defendant was to be incarcerated.”
And, with regard to an indeterminate sentence, the legislature had granted authority to the Executive Branch to establish an inmate’s actual duration of imprisonment, using a parole matrix that the legislature directed the board to create. Id. at 381; Or Laws 1977, ch 372, § 2.
Oregon had an indeterminate sentencing scheme before 1989 and used a parole matrix system for establishing the actual term of imprisonment for most felony offenders. 340 Or at 831. In 1989, the legislature replaced that scheme with a new “guidelines” sentencing scheme, under which the Judicial Branch (judges) are required to impose determinate sentences — defined presumptive punishments, based on sentencing guidelines that were created by the State Sentencing Guidelines Board and later approved by the state legislature —for most felony convictions. Under the guidelines scheme, judges have little discretion to deviate from the guidelines ranges and criminal defendants subject to guidelines sentencing are not eligible for release on parole. Id.; Engweiler v. Board of Parole, 343 Or 536, 540-41, 175 P3d 408 (2007) (Engweiler V).
However, juvenile aggravated murderers like Engweiler and Sopher continued to receive life sentences until 1995. Engweiler IV, 340 Or at 381-82 (inmates who committed aggravated murder after November 1, 1989, but who were juveniles at the time of their crimes continued to receive indeterminate sentences and the board set their terms of incarceration); Engweiler V, 343 Or at 545 (juvenile aggravated murderers are entitled to the possibility of parole).
*599 Although juvenile aggravated murderers were entitled to the possibility of parole after 1989, the board had no rules governing parole decisions for them. See Engweiler V, 343 Or at 548 (board rules “contained a void” with respect to juvenile aggravated murderers). In 1999, to address that situation, the board promulgated a set of administrative rules to be applied to determine whether and when to grant parole release to juvenile aggravated murderers. Those rules are known as the JAM rules. As this court explained in Engweiler V,
“[T]he JAM rules require the board to hold an initial ‘prison term hearing’ for juveniles convicted of murder who were under age 17 at the time of the offense. OAR 255-032-0005(4) (1999). At that hearing, the board sets ‘a review date * * * rather than a projected parole release date.’ Id. Alternatively, the board may ‘deny parole’ altogether. OAR 255-032-0011(2) (1999). If the board opts to set a review date, it does so based on a parole release matrix that it adopted specifically for juvenile aggravated murderers who are eligible for parole consideration. Id. (cross-referencing Exhibit P-III). Essentially, that matrix establishes ranges of time periods that dictate whether and when a juvenile aggravated murderer will be reviewed for parole eligibility and will receive a parole release date. At the low end, the matrix can result in a review date between 240 and 300 months. Id. At the high end, it can result in a ‘life’ term, which is a denial of parole. Id. The review date then triggers a schedule for further board review of the inmate’s institutional conduct and rehabilitation efforts, after which the board may establish a parole release date under the matrix or may set another review date at which it will further review the inmate’s conduct and rehabilitation efforts. OAR 255-032-0011(6)-(7) (1999); see also State ex rel Engweiler, 340 Or at 383 (so concluding). If the board denies parole, the inmate is not totally foreclosed from future parole consideration. Rather, after 480 months, the inmate may petition the board for further review, and then may continue to do so periodically. OAR 255-032-0011(5), (7) (1999).”
343 Or at 549. Pursuant to the JAM rules, the board conducted a prison term hearing for Engweiler in June 1999 and set a review date for him in 2030, after 480 months (40 years) of incarceration. The board conducted a prison term hearing for Sopher in August 1999, and set a review date for *600 him in 2025, after 400 months (33 years and 4 months) of incarceration.
Subsequently, both Engweiler and Sopher petitioned for judicial review of the board orders setting their review dates. In each case, the Court of Appeals held that the board’s order setting the review date was not subject to judicial review. Engweiler v. Board of Parole, 197 Or App 43, 103 P3d 1201 (2005) (Engweiler II); Sopher v. Board of Parole, 197 Or App 118, 103 P3d 683 (2005) (Sopher I).
Engweiler petitioned for review, and this court affirmed the Court of Appeals decision in his case. Engweiler v. Board of Parole, 340 Or 361, 133 P3d 910 (2006) (Engweiler III).
Sopher took a different tack. In 2005, he initiated a rule challenge in the Court of Appeals under ORS 183.400, which permits such actions but limits judicial review to an examination of the rule under review, the statutory provisions authorizing the rule, and the documents demonstrating compliance with applicable rulemaking procedures.[5] Sopher argued that, by requiring juvenile aggravated murderers to complete an intermediate review process before the board *601 considers them for parole eligibility, the JAM rules imper-missibly deprive juvenile aggravated murderers of the immediate parole release eligibility that ORS 161.620 guarantees them. Specifically, he argued that the board relied on ORS 144.110(2)(b) (1997), ORS 163.105(1) (1997), ORS 144.780 (1997), and ORS 161.620 (1994) in promulgating the JAM rules, but that none of those statutes authorized the board to require that intermediate review process for juvenile aggravated murderers.
While that rule challenge was pending in the Court of Appeals, both Engweiler and Sopher also brought the instant mandamus actions to compel the board to conduct hearings and establish initial release dates for both of them under ORS 144.120(1)(a) (1989) (in Engweiler’s case) and ORS 144.120(1)(a) (1991) (in Sopher’s).[6]
In his mandamus action, Engweiler argued that ORS 144.120(1)(a) (1989) required that process in his case. That statute provided:
“Within six months of the admission of a prisoner to any Department of Corrections institution, with the exception of those prisoners sentenced to a term of imprisonment for life or for more than five years, the board shall conduct a parole hearing to interview the prisoner and set the initial date of release on parole pursuant to subsection (2) of this section. For those prisoners sentenced to a term of imprisonment for more than five years but less than 15 years, the board shall conduct the parole hearing and set the initial date of release within eight months following admission of the prisoner to the institution. For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution. Release shall be contingent upon satisfaction of the requirements of ORS 144.125.”
*602 (Emphasis added.) Engweiler argued that the wording in the foregoing statute is mandatory and gave the board no discretion to decline to conduct a hearing and set an initial release date. The board replied that, in 1991, ORS 144.120(l)(a) was amended to exclude offenders who were sentenced for murder or aggravated murder,[7] and that the 1991 version of the statute applied to Engweiler because he was resentenced in 1994. Engweiler responded that application of the 1991 version of the statute to him would violate constitutional ex post facto prohibitions. The board countered that the amendment was procedural rather than substantive and, therefore, that the amended statute constitutionally could be applied in Engweiler’s case. The trial court rejected the board’s argument; it concluded that the 1989 version of the statute applied to Engweiler and that that statute required the board to conduct a hearing and set an initial release date. Accordingly, the trial court issued a writ directing the board to hold a hearing and set an initial release date as provided in that statute.
The board appealed that ruling to the Court of Appeals. On appeal, the board repeated its argument that the 1991 version of ORS 144.110(1)(a) applied in Engweiler’s case because he had been resentenced in 1994, and that that statute clearly excluded those sentenced for aggravated murder from the hearing requirement. In addition, the board argued that, even if the 1991 version did not apply, the 1989 version did not mandate a hearing in Engweiler’s case, because ORS 144.120 is qualified by another, related statute, ORS 144.110(2)(b), which provided that ORS 144.120 (1989) did not apply to prisoners who had been convicted of aggravated murder.
The Court of Appeals reversed. That court did not address whether the 1991 or 1989 version of ORS 144.120 applied, because it agreed with the board’s second argument.
*603 The Court of Appeals observed that “ORS 144.110(2)(b) (1989) operated as an exception to ORS 144.120(1)(a) (1989).” Engweiler VI, 232 Or App at 223. ORS 144.110(2)(b) (1989)[8] provided:
“Notwithstanding the provisions of ORS 144.120 [relating to parole hearings and the setting of initial parole release dates] and 144.780 [directing the board to promulgate rules establishing the parole matrix]:
* * * *
“(b) The board shall not release a prisoner on parole who has been convicted of murder defined as aggravated murder under the provisions of ORS 163.095, except as provided in ORS 163.105.”
ORS 163.105 (1989)[9] provided, in turn, as follows:
“Notwithstanding the provisions of ORS chapter 144 [relating generally to parole and work release], ORS 421.165 [relating to temporary leave] and ORS 421.450 to 421.490 [relating to forest and work camps]:
“(1) When a defendant is convicted of aggravated murder as defined by ORS 163.095, the defendant shall be sentenced, pursuant to ORS 163.150, to death, life imprisonment without the possibility of release or parole or life imprisonment.
«ífí % ‡ ifc
“(c) If sentenced to life imprisonment, the court shall order that the defendant shall be confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp.
“(2) At any time after 20 years from the date of imposition of a minimum period of confinement pursuant to paragraph (c) of subsection (1) of this section, the State Board of Parole and Post-Prison Supervision, upon the petition of *604 a prisoner so confined, shall hold a hearing to determine if the prisoner is likely to be rehabilitated within a reasonable period of time. The sole issue shall be whether or not the prisoner is likely to be rehabilitated within a reasonable period of time. * * *.
“(3) If, upon hearing all of the evidence, the board, upon a unanimous vote of all five members, finds that the prisoner is capable of rehabilitation and that the terms of the prisoner’s confinement should be changed to life imprisonment with the possibility of parole, or work release, it shall enter an order to that effect and the order shall convert the terms of the prisoner’s confinement to life imprisonment with the possibility of parole or work release. Otherwise, the board shall deny the relief sought in the petition.
“(4) Not less than two years after the denial of the relief sought in a petition under this section, the prisoner may petition again for a change in the terms of confinement. Further petitions for a change may be filed at intervals of not less than two years thereafter.”
The Court of Appeals noted that, on its face, ORS 144.110(2)(b) appeared directly applicable to Engweiler. Engweiler VI, 232 Or App at 223.
However, the court acknowledged, ORS 161.620 (1989),[10] which limited courts’ sentencing options for juvenile aggravated murderers, rendered parts of ORS 163.105 inapplicable to juvenile aggravated murderers. ORS 161.620 provided:
“Notwithstanding any other provision of law, a sentence imposed upon any person remanded from the juvenile court under [former] ORS 419.533 [(1989)] shall not include any sentence of death or life imprisonment without the possibility of release or parole nor imposition of any mandatory minimum sentence except that a mandatory minimum sentence under ORS 163.105(1)(c) shall be imposed where the person was 17 years of age at the time of the offense.”
*605 Engweiler had argued that that statute irreconcilably conflicted with the application of ORS 144.110 and ORS 163.105 to juvenile aggravated murderers, because the assumption underlying the latter two statutes — that an aggravated murderer will be sentenced to no less than a 30-year mandatory minimum term of imprisonment — does not apply to juveniles, and, therefore, the parole release process set out in ORS 163.105(2) to (4) cannot apply either. The Court of Appeals rejected that argument, concluding that it was possible to harmonize all the applicable statutes. That court reasoned that ORS 161.620 was a directive to the sentencing courts limiting the types of sentences that may be imposed for the crime of aggravated murder when committed by a juvenile under the age of 17:
“[That statute] said nothing, however, about the authority of the board to implement the remaining portions of the statute concerning release decisions, as set out in ORS 163.105(2) to (4) (1989). * * * In other words, merely because a court may not impose a particular sentence mentioned in ORS 163.105(1) does not necessarily require the conclusion that the board does not remain subject to the requirements of the balance of the statute with respect to juvenile aggravated murderers.”
Engweiler VI, 232 Or App at 227 (emphasis in original). According to the Court of Appeals, the parts of ORS 163.105 — subsections (2) and (3) — that provide for the conversion by the board of a 30-year mandatory minimum sentence for aggravated murderers who have shown that they are capable of rehabilitation are not in conflict with ORS 161.620, which merely states that trial courts cannot impose mandatory minimum sentences on juvenile aggravated murderers. Id. at 227-28.
Finally, the Court of Appeals rejected Engweiler’s argument that ORS 163.105(2) to (4) are inapplicable to his case because they provide for the “conversion” of a mandatory minimum sentence to a sentence of life imprisonment, and he already is serving such a sentence. The court disagreed, stating,
“An assumption implicit in [Engweiler’s] argument is that the existence of some measure of redundancy in one or more statutes necessarily establishes an irreconcilable conflict *606 between them. The assumption simply is not consistent with relevant case law. * * * Particularly — as in this case— when the alternative to accepting a measure of redundancy in legislation is to hold that some portion of a statute simply does not mean what it says, the courts routinely hold in favor of allowing for the redundancy.”
Id. at 228. The Court of Appeals concluded that the focus of ORS 163.105(2) and (3) is on the board’s obligation to determine the prisoner’s rehabilitation status, and the mandate in those subsections for the board to “convert” the terms of the prisoner’s confinement “is insufficient to nullify that purpose and the relevant procedures.” Id. at 229.
As noted, Sopher also sought a writ of mandamus to compel the board to conduct a hearing and set an initial release date for him. In Sopher’s case, the 1991 version of the statute clearly applied. The trial court in his case concluded that the board had no duty under that statute to set a parole release date, because the 1991 version of the statute expressly excluded offenders convicted of aggravated murder. Sopher appealed, and the Court of Appeals affirmed the trial court’s ruling. That court agreed that ORS 144.120(1)(a) (1991) did not require a hearing or parole release date for any person who had been convicted of aggravated murder, and it noted that, in any event, in Engweiler VI, it held that juvenile aggravated murderers were subject to the aggravated murder review hearing process set out in ORS 144.110(2)(a) and ORS 163.105, and not the initial parole hearing process set out in ORS 144.120(1)(a).[11] Sopher III, 233 Or App at 236.
In Sopher’s rule challenge, the Court of Appeals rejected Sopher’s argument that the board exceeded its statutory authority in promulgating the JAM rules, for the same reasons that it rejected Engweiler’s arguments in Engweiler *607 VI. That is, the court stated that it held in Engweiler VI that, “consistently with ORS 161.620, juvenile aggravated murderers are subject to the standards and procedures described in ORS 144.110(2)(b) and ORS 163.105(2) to (4).” Sopher II, 233 Or App at 186. And, for that reason, the court held, the JAM rules, which implemented those standards and procedures, did not exceed the board’s statutory authority under ORS 161.620. Id.
II. DISCUSSION
At the outset, we believe it is important to keep in mind, as we have set out above, that this court is not writing on a clean slate. As noted, this court has addressed issues regarding Engweiler’s sentence and incarceration on three previous occasions. Thus, with regard to Engweiler directly, and with regard to Sopher as a matter of precedent, the following legal principles are already established.
First, in Engweiler TV, this court described Engweiler’s sentence as “life imprisonment with the possibility of release or parole” and observed that Engweiler was in the same position as an inmate serving an indeterminate sentence before the adoption of the guidelines sentencing scheme: The board is responsible for determining the actual duration of his imprisonment. 340 Or at 383.
Second, in Engweiler V, this court concluded that the “[n]otwithstanding any other provision of law” clause at the beginning of the text of ORS 161.620 (1989) means
“that the terms of ORS 161.620 (1989) prevailed over ‘any other provision of law.’ In other words, the notwithstanding clause ‘ma[kes] it irrelevant that ORS 144.110(2)(b) (1989) and ORS 163.105(1) (1989) each mandated a minimum sentence of 30 years without the possibility of parole for any person convicted of aggravated murder and made no exception for persons who were juveniles under the age of 17 when they committed [aggravated murder].”
343 Or at 544.
Third, in Engweiler V, the court also observed, as it had earlier in Engweiler TV, that juvenile aggravated murderers are “a small class of inmates who continued to receive *608 indeterminate sentences,” Engweiler IV, 340 Or at 381, and who are entitled to parole consideration:
“ORS 161.620 (1989) trumped [ORS 144.110(2)(b) (1989) and ORS 163.105(1) (1989)] by precluding imposition of the 30-year mandatory minimum sentence otherwise authorized by ORS 163.105(1) (1989) for juveniles who were under age 17 when they committed aggravated murder. Consequently, petitioners must be entitled to the possibility of parole.”
Engweiler V, 343 Or at 545 (emphasis added).
Finally, in Engweiler V, this court observed that when Engweiler committed his crime, “none of the board’s existing rules provided either procedural or substantive mechanisms to determine whether and when to parole juvenile aggravated murderers.” Id. at 546.
Based on the foregoing, to resolve the rule challenge and the mandamus cases, this court must decide two questions with regard to each inmate: To what extent has the legislature granted the board authority to make parole release decisions in the case of juvenile aggravated murderers like these inmates? And, if the legislature has granted the board authority to make parole release decisions in these cases, what release procedures and criteria did the legislature intend for the board to apply with regard to each inmate?
To answer those questions, we first examine ORS 163.105, which grants the Executive Branch, through the board, release authority regarding inmates convicted of aggravated murder and sentenced to life imprisonment with a minimum period of confinement of 30 years without the possibility of parole. We begin with that statute because the Court of Appeals concluded that ORS 163.105(2) to (4) apply to juvenile aggravated murderers, and thus authorized the board to adopt the JAM rules implementing release procedures that mirror, in many respects, the statutory requirements set out in ORS 163.105. For convenience, we set out the pertinent parts of ORS 163.105 again here:
“Notwithstanding the provisions of ORS chapter 144 [relating to parole and work release], ORS 421.165 [relating to *609 temporary leave] and ORS 421.450 to 421.490 [relating to forest and work camps]:
“(1) When a defendant is convicted of aggravated murder as defined by ORS 163.095, the defendant shall be sentenced, pursuant to ORS 163.150, to death, life imprisonment without the possibility of release or parole or life imprisonment.
“(c) If sentenced to life imprisonment, the court shall order that the defendant shall be confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp.
“(2) At any time after 20 years from the date of imposition of a minimum period of confinement pursuant to paragraph (c) of subsection (1) of this section, the State Board of Parole and Post-Prison Supervision, upon the petition of a prisoner so confined, shall hold a hearing to determine if the prisoner is likely to be rehabilitated within a reasonable period of time. The sole issue shall be whether or not the prisoner is likely to be rehabilitated within a reasonable period of time. * * *.
“(3) If, upon hearing all of the evidence, the board, upon a unanimous vote of all five members, finds that the prisoner is capable of rehabilitation and that the terms of the prisoner’s confinement should be changed to life imprisonment with the possibility of parole, or work release, it shall enter an order to that effect and the order shall convert the terms of the prisoner’s confinement to life imprisonment with the possibility of parole or work release. Otherwise, the board shall deny the relief sought in the petition.
“(4) Not less than two years after the denial of the relief sought in a petition under this section, the prisoner may petition again for a change in the terms of confinement. Further petitions for a change may be filed at intervals of not less than two years thereafter.”
Subsection (1) of ORS 163.105 is a directive to the Judicial Branch delineating three potential sentences that a trial court could impose for the crime of aggravated murder: death, life imprisonment without the possibility of parole *610 (known as “true life”), and life imprisonment. For those defendants convicted of aggravated murder and sentenced by the trial court to life imprisonment, ORS 163.105(1)(c) further requires that the trial court order the defendant to serve a mandatory minimum sentence of 30 years without the possibility of parole or work release.
As we already have discussed, at the time that Engweiler and Sopher committed their crimes, those sentencing options applied only to adult aggravated murderers. That is so, because another statute, ORS 161.620, limited the trial courts’ sentencing options for juvenile offenders. Again, for convenience, we set out ORS 161.620 here:
“Notwithstanding any other provision of law, a sentence imposed upon any person remanded from the juvenile court under [former] ORS 419.533 [(1989)] shall not include any sentence of death or life imprisonment without the possibility of release or parole nor imposition of any mandatory minimum sentence except that a mandatory minimum sentence under ORS 163.105(1)(c) shall be imposed where the person was 17 years of age at the time of the offense.”
(Emphasis added.) Also, as explained earlier, this court has stated that the “notwithstanding” clause in that statute means that the terms of ORS 161.620 “prevail[ ] ‘over any other provision of law,’ ” Engweiler V, 343 Or at 544, including, as relevant in this case, ORS 163.105. ORS 161.620 provides that no juvenile can be sentenced to death or true life. In addition, for those juveniles who were under the age of 17 when they committed their crimes, ORS 161.620 prohibited the trial courts from imposing any statutorily required minimum sentence. See State v. Jones, 315 Or 225, 230-31, 844 P2d 188 (1992) (so holding). Those provisions, taken together, meant that “the only sentencing option available [to the trial court for juveniles convicted of aggravated murder] was life imprisonment with the possibility of release or parole.” Engweiler W, 340 Or at 383.
The remaining subsections of ORS 163.105 provide a procedure under which the board may override a 30-year mandatory minimum sentence imposed by the trial court under subsection (1). See Janowski / Fleming v. Board of Parole, 349 Or 432, 446, 245 P3d 1270 (2010) (ORS 163.105 *611 gave board authority to override 30-year mandatory minimum sentence for aggravated murder and to consider releasing a prisoner on parole after 20 years upon a finding that he is likely to be rehabilitated). Specifically, subsection (2) provides that a prisoner serving a 30-year mandatory minimum sentence for aggravated murder may seek a “hearing to determine if [he] is likely to be rehabilitated within a reasonable period of time,” and it describes the timing for such a hearing: “any time after 20 years from the date of imposition of a minimum period of confinement pursuant to paragraph (c) of subsection (1) of this section.” If the board unanimously finds that a prisoner is “capable of rehabilitation,” then the board, pursuant to subsection (3) “shall convert the terms of the prisoner’s confinement to life imprisonment with the possibility of parole.” Finally, subsection (4) provides a mechanism for a prisoner who was unsuccessful in persuading the board to convert his mandatory minimum sentence to a sentence of life in prison with the possibility of parole to petition again after two years for “a change in the terms of confinement.”
As the wording of those subsections make plain, they have no applicability to a prisoner who is not serving a mandatory minimum sentence. First, as this court stated in Severy / Wilson v. Board of Parole, 349 Or 461, 475, 245 P3d 119 (2010):
“[u]nder the plain words of [ORS 163.105(2)], the trigger for the rehabilitation hearing is the ‘imposition’ of [a] minimum period of confinement. Only a court ‘imposes’ a sentence in a criminal case.”
Thus, for juvenile aggravated murderers, the “trigger” for the rehabilitation hearing never occurred; ORS 161.620 prohibited trial courts from imposing a minimum period of confinement. Moreover, although the “sole issue” to be decided at the hearing described in ORS 163.105(2) to (4) is “whether or not the prisoner is likely to be rehabilitated in a reasonable period of time,” ORS 163.105(2), the only authority that the legislature granted to the board upon its finding that the prisoner was capable of rehabilitation was to perform an act that is entirely unnecessary in the case of juvenile aggravated murderers: to change the terms of the prisoner’s confinement from a prohibition on eligibility for parole to the *612 possibility of parole. See Severy/Wilson, 349 Or at 477 (in requiring board to convert terms of prisoner’s confinement to life with the possibility of parole, ORS 163.105(3) required the board to convert prohibition on eligibility for parole to possibility of parole). Juvenile aggravated murderers need no such change; they are “entitled to the possibility of parole” from the time that the trial court imposed its sentence of life in prison. See Engweiler V, 343 Or at 545 (juvenile aggravated murderers are “entitled to the possibility of parole”). Finally, ORS 163.105(4) indicates that the very purpose of a prisoner’s petition for that hearing is to obtain that change from prohibition to eligibility for parole:
“Not less than two years after the denial of the relief sought in a petition under this section, the prisoner may petition again for a change in the terms of confinement.”
It is clear from the foregoing that the relief that the prisoner seeks in demonstrating rehabilitation at a hearing under ORS 163.105(2) to (4) is the conversion of the prisoner’s mandatory minimum sentence to life with the possibility of parole. That relief is pointless in the case of a prisoner already serving a sentence of life imprisonment with the possibility of parole.[12] It follows that ORS 163.105(2) to (4) are not applicable to juvenile aggravated murderers.[13]
*613 ORS 144.110(2)(b), which provides that the board “shall not release a prisoner on parole who has been convicted of * * * aggravated murder * * * except as provided in ORS 163.105” is not inconsistent with that conclusion. We acknowledge that that paragraph appears, superficially, to support the notion that all aggravated murderers, including juveniles, can be released on parole only in compliance with ORS 163.105. However, when that paragraph is considered in context, it is clear that that paragraph bolsters, rather than undermines, our conclusion that ORS 163.105 is inapplicable to juvenile aggravated murders.
ORS 144.110 provides as follows:
“(1) In any felony case, the court may impose a minimum term of imprisonment of up to one-half of the sentence it imposes.
“(2) Notwithstanding the provisions of ORS 144.120 [dealing with release on parole according to matrix] and 144.780 [directing board to adopt rules establishing matrix]:
“(a) The board shall not release a prisoner on parole who has been sentenced under subsection (1) of this section until the minimum term has been served, except upon affirmative vote of at least four members of the board.
*614 “(b) The board shall not release a prisoner on parole who has been convicted of murder defined as aggravated murder under the provisions of ORS 163.095, except as provided in ORS 163.105.”
That statute “deals with restrictions on paroling persons who have been sentenced to minimum terms.” Janowski / Fleming, 349 Or at 443. As this court explained in Janowski / Fleming, ORS 144.110 has two parts. The first part grants trial courts discretion to impose minimum periods of imprisonment for adults convicted of felonies other than aggravated murder. Janowski / Fleming, 349 Or at 443. As noted, such discretion generally is unnecessary for aggravated murderers; under ORS 163.105, the trial court must impose a 30-year mandatory minimum sentence for aggravated murder (if the defendant was not given the death penalty or true life). And, as this court further explained in Janowski / Fleming, the second part
“set out two processes for effectively overriding those mandatory minimum sentences. The processes were parallel, a fact demonstrated by their use of identical wording in paragraphs (2)(a) and (2)(b), viz., ‘The board shall not release a prisoner on parole * * * except * * */ Under paragraph (2)(a), in cases in which the court had imposed mandatory minimum sentences for felonies other than aggravated murder, the board had the authority to override those mandatory minimum sentences if four of the five board members agreed. Paragraph (2)(b), which prohibited the board from releasing on parole a prisoner who had been convicted of aggravated murder ‘except as provided in ORS 163.105/ gave the board similar authority, albeit with more onerous preconditions: In the case of prisoners convicted of aggravated murder, the prisoner was not permitted to seek a rehabilitation hearing that might lead to an override of the prisoner’s judicially imposed sentence until he already had been incarcerated for 20 years, the burden was on the prisoner to convince the board that he was likely to be rehabilitated within a reasonable time, and the board was required to agree with the prisoner unanimously rather than by a four-of-five member vote. ORS 163.105(2), (3).”
Janowski / Fleming, 349 Or at 443-44 (footnote omitted). In context, and read together with ORS 163.105, it is clear that *615 ORS 144.110(2)(b) refers to a process for overriding the mandatory minimum sentence required to be imposed for aggravated murder, parallel to the process set out in subparagraph (2)(a) for overriding the mandatory minimum sentence that the trial court, in its discretion, has imposed for other types of felonies. Those parallel processes for overriding mandatory minimum sentences have no bearing on the board’s parole release decisions respecting prisoners who are not serving mandatory minimum sentences. And because, under ORS 161.620, trial courts were not permitted to impose minimum sentences on juveniles, it follows that the process referred to in ORS 144.110(2)(b) has no applicability to juvenile aggravated murderers.[14]
*616 Our conclusions respecting the applicability of ORS 163.105(2) to (4) and ORS 144.110(2)(b) to juvenile aggravated murderers constitute the first step in the resolution of Sopher’s petition for review of the Court of Appeals decision in the rule challenge case. That is, because we hold that ORS 144.110 and ORS 163.105 do not apply to juvenile aggravated murderers, it necessarily follows that neither of those statutes provide authority to the board to require, under the JAM rules, that a juvenile aggravated murderer undergo an intermediate review process to demonstrate that he is capable of rehabilitation before he is deemed eligible for parole consideration. Therefore, before turning to the other issues presented in these cases, we complete our analysis in the rule challenge.[15]
*617 As discussed above, in a rule challenge under ORS 183.400, judicial review is
“limited to an examination of:
“(a) [t]he rule under review;
“(b) [t]he statutory provisions authorizing the rule; and
“(c) [cjopies of all documents necessary to demonstrate compliance with applicable rulemaking procedures.”
ORS 183.400(3). Moreover, a court may declare a rule invalid
“only if it finds that the rule:
“(a) [v]iolates constitutional provisions;
“(b) [elxceeds the statutory authority of the agency; or
“(c) [w]as adopted without compliance with applicable rulemaking procedures.”
ORS 183.400(4). Sopher has not challenged the JAM rules on the ground that the board failed to comply with applicable rulemaking procedures. He does, however, challenge the rules on the grounds that they exceeded the board’s statutory authority and that they violated certain constitutional provisions. Consistent with this court’s preferred practice in dealing with legal challenges to administrative rules under ORS 183.400, we consider statutory questions before turning to constitutional issues. Oregon Newspaper Publishers v. Dept. of Corrections, 329 Or 115, 119, 988 P2d 359 (1999) (so holding).
The JAM rules consist of the 1999 amendments to OAR 255-032-0005, OAR 255-032-0010, OAR 255-032-0015, and OAR 255-032-0020, as well as the then-newly adopted OAR 255-032-0011 and certain exhibits setting out the matrix ranges for juvenile aggravated murderers. OAR 255-032-0005, OAR 255-032-0010, OAR 255-032-0015, and OAR *618 255-032-0020 were amended to add the word “adult” in various places, to clarify when juveniles were excluded from the review process outlines in those rules. In addition, OAR 255-032-0005 was amended to include the following:
“(4) Inmates, who were juveniles and waived to the adult court pursuant to ORS 419C.340 through 419C.364, and were under the age of 17 years at the time of their crime(s), and were convicted of Aggravated Murder, per ORS 163.095, and whose crimes were committed after October 31, 1989 and prior to April 1, 1995, shall receive a prison term hearing. At the hearing, the Board shall set a review date consistent with the terms set forth in OAR 255-032-0011, rather than a projected parole release date.”
OAR 255-032-0011 provides:
“(1) The Board shall conduct a hearing pursuant to OAR 255-030-0013, 255-030-0015, 255-030-0021, 255-030-0023 and 255-030-0025 through 255-030-0055.
“(2) The Board shall set a review date pursuant to Exhibit P-III, or deny parole, pursuant to OAR 255-035-0030.
“(3) The method established by sections (1) to (3) of OAR 255-035-0021 shall not apply to inmates described in 255-032-0005(4). To determine the unified range for inmates described in OAR 255-032-0005(4) with consecutive sentences for aggravated murder, the Board shall establish the matrix range for each crime by using the inmate’s history/risk score pursuant to Exhibit P-III. The unified range shall be the sum of the ranges established under this section.
“(4) The Board may depart from the appropriate matrix range for inmates described in OAR 255-032-0005(4) only upon making a specific finding that there is aggravation or mitigation which justifies departure from the range pursuant to Exhibits E-l and E-2. The Board shall clearly state on the record the facts and specific reasons for its finding. The Board may give items of aggravation and mitigation different weight and not necessarily balance them one for one. Exhibit D does not apply to inmates described in 255-032-0005(4). The Board cannot apply aggravating or mitigating factors to adjust an *619 inmate’s matrix range more than one level up or down. Mitigating factors cannot reduce an inmate’s matrix range below the lowest possible range on the matrix.
“(5) If the Board denies parole, the inmate may petition for review after 480 months from the adjusted inception date. If the Board determines, following a review of the inmate’s petition and institutional record, there is reasonable grounds to believe that rehabilitation may have occurred and that the possibility of parole should be considered, a review hearing shall be scheduled.
“(6) If the Board sets a review date pursuant to Exhibit P-III, the Board shall conduct a progress review five years prior to the established review date. The progress review does not require a hearing with the inmate; however, the inmate may submit materials to be considered. The purpose of the progress review is to determine the inmate’s institutional conduct and rehabilitation efforts since the prison term hearing.
“(7) The Board may determine a parole release date or future review dates any time after the established review date. The Board may order a psychological evaluation. Refusal to submit to an evaluation if one is ordered will be grounds for automatic deferral of the hearing for up to five years or a lesser time if deemed appropriate by the Board. If parole was previously denied, that decision will remain in effect and further petitions for review will not be considered at less than two (2) year intervals.
“(8) At the review hearing, the Board will consider, but is not limited to, the following:
“[various indicia of rehabilitation] * * *.
“The decision for the Board shall be whether there are significant indications of reformation and rehabilitation such that the offender does not represent a risk to the community and that it is in the offender’s and the community’s best interest that he/she be released to the community under conditions of supervision.
“If the Board does not make the above finding, the Board shall set a subsequent review hearing date not to exceed five (5) years from the present review.”
Exhibit P-III, referred to in the foregoing rule, sets out the juvenile aggravated murder matrix.
*620 Again as noted, in promulgating the JAM rules, the board cited four sources of statutory authority: ORS 144.110(2)(b) (1997), ORS 163.105(1) (1997), ORS 161.620 (1994), and ORS 144.780 (1997). Sopher argues that the board promulgated the JAM rules based on a misunderstanding of the relevant laws and, as a consequence, it created rules that “depart[ ] from the legal standard expressed or implied in the enabling statute[s],” quoting Gilliam County v. Dept. of Environmental Quality, 316 Or 99, 106, 849 P2d 500 (1993), rev’cl on other grounds sub nom Oregon Waste Sys. v. Department of Environmental Quality, 511 US 93, 114 S Ct 1345, 128 L Ed 2d 13 (1994). Specifically, Sopher argues that neither ORS 163.105(1), which provides three sentencing options for adult aggravated murderers (none of which may be imposed on juvenile aggravated murderers), nor any other part of ORS 163.105, gives the board authority to impose the intermediate review procedure outlined in ORS 163.105 to juvenile aggravated murderers. Similarly, Sopher argues, ORS 144.110(2)(b) provides the board with no such authority. As already discussed at length, we agree on both counts.
Sopher also argues that neither ORS 161.620 nor ORS 144.780 provides a source of authority for requiring juvenile aggravated murderers to prove rehabilitation before becoming eligible for parole release. We agree. As discussed above, ORS 161.620 is a limitation on the options available to the trial court in sentencing juvenile felony offenders in general, and specifically, juvenile aggravated murderers under the age of 17 at the time of their offense. That statute has no application to the authority of the board (a separate branch of government) to make parole release decisions for juvenile aggravated murderers. Likewise, ORS 144.780, which directs the board to “adopt rules establishing ranges of duration of imprisonment to be served for felony offenses prior to release on parole,” cannot be read to authorize the board to require juvenile aggravated murderers to undergo an intermediate review process before becoming eligible for parole release.[16]
*621 At the same time, Sopher argues, ORS 144.120(1)(a) requires the board to conduct a parole hearing and set a parole release date, and the JAM rules, by setting review dates rather than release dates, conflict with that statute. As discussed above, the 1989 version of ORS 144.120(1)(a) provided as follows:
“Within six months of the admission of a prisoner to any Department of Corrections institution, with the exception of those prisoners sentenced to a term of imprisonment for life or for more than five years, the board shall conduct a parole hearing to interview the prisoner and set the initial date of release on parole pursuant to subsection (2) of this section. For those prisoners sentenced to a term of imprisonment for more than five years but less than 15 years, the board shall conduct the parole hearing and set the initial date of release within eight months following admission of the prisoner to the institution. For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution. Release shall be contingent upon satisfaction of the requirements of ORS 144.125.”
(Emphasis added.)
We conclude that that statute required the board to conduct a parole hearing for offenders sentenced to life in prison within one year after an offender’s admission to prison, even if the offender had been convicted of aggravated murder. The statute uses the mandatory word “shall” and contains no exceptions depending on the nature of the crime committed.[17] Therefore, we conclude that the JAM rule requirement that a juvenile aggravated murderer undergo an intermediate hearing no less than 20 years after his admission to prison before he is eligible for parole consideration is in direct conflict with ORS 144.120(1)(a) (1989).
*622 However, in 1991, before Sopher committed his crime, the legislature added a phrase to ORS 144.120, amending the wording in paragraph (1)(a) that is italicized above to read as follows:
“For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, with the exception of those sentenced for aggravated murder, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution.”
Or Laws 1991, ch 126, § 6 (emphasis added). As noted, the trial court in Sopher’s mandamus case, and the Court of Appeals in Sopher III, concluded that that wording meant that, after 1991, aggravated murderers were not entitled to a parole hearing.[18]
Sopher argues, to the contrary, that the exception for aggravated murderers added to ORS 144.120(1)(a) in 1991 applies only to the timing of parole hearings, not to the requirement that the board conduct such hearings at all. That is, Sopher argues, the amendment removed the requirement that the board conduct parole hearings within one year of an aggravated murderer’s admission to prison, but ORS 144.120(1)(a) (1991) continued to mandate that the board conduct such hearings for aggravated murderers at some point.[19]
*623 In interpreting a statute, our task is to attempt to discern the intent of the legislature. State v. Gaines, 346 Or 160, 171, 206 P3d 1042 (2009) (discerning the intent of the legislature is the court’s “paramount goal” in statutory interpretation). We begin by considering the text and context of the statute. Id. We then turn to any pertinent legislative history that the parties have offered. Id. at 172.
We agree that the text of ORS 144.120 is ambiguous and capable of two plausible interpretations. It is not clear from the text alone whether the legislature intended the 1991 addition of the words “with the exception of those sentenced for aggravated murder” to exclude all aggravated murderers from a parole hearing, or merely to except them from the requirement that the hearing be held within one year of the prisoner’s admission to prison. Context, however, suggests that the legislature intended to except aggravated murderers from the timing requirement only.
The first contextual clue is in the legislative note that follows ORS 144.110, which states that
“Section 28, chapter 790, Oregon Laws 1989 provides:
“Sec. 28. The provisions of ORS 144.110, 144.120, 144.122, 144.125, 144.130, 144.135, 144.185, 144.223, 144.245, 144.270 and 144.305 apply only to offenders convicted of a crime committed prior to November 1, 1989, and to offenders convicted of aggravated murder or murder regardless of the date of the crime.”
That note explicitly provides that ORS 144.120 continues to apply to prisoners who have been convicted of aggravated murder, “regardless of the date of the crime.” That means that ORS 144.120 (1991) applied to Sopher, who committed his crime in 1992. All parts of ORS 144.120 (1991) deal with *624 the prisoner’s entitlement to a parole hearing and the setting of initial release dates,[20] and the only part of ORS 144.120 *625 (1991) that specifically addresses aggravated murderers is the disputed provision in ORS 144.120(1)(a). An interpretation of ORS 144.120(1)(a) (1991) that entirely exempts aggravated murders from the hearing requirement would directly conflict with the legislative note. The only way to give effect to both provisions is to read ORS 144.120(1)(a) as Sopher suggests: the exception for those convicted of aggravated murder applies only to the timing of the parole hearing; in the case of aggravated murderers, it need not be conducted within one year of the prisoner’s admission to prison. The exception does not mean that aggravated murderers are not entitled to a parole hearing at all. That interpretation is consistent with the directive in ORS 161.620, which, as this court stated in Engweiler V, requires that juvenile aggravated murderers “must be entitled to the possibility of parole.” 343 Or at 545.
Likewise, ORS 163.105 also provides relevant context. As we explained above, that statute provides that adult aggravated murderers who have been sentenced to life in prison with a 30-year mandatory minimum term of incarceration may have their sentences converted after 20 years to life in prison with the possibility of parole if they demonstrate to the board that they are capable of rehabilitation. And, as this court recently held in Janowski / Fleming, prisoners whose sentences are so converted are then immediately entitled to parole consideration. 349 Or at 456. If we were to read the 1991 amendments to wholly eliminate aggravated murder from the provisions of ORS 144.120, then there is no statutory authority for the board to set an initial release date for aggravated murderers entitled to parole consideration under ORS 163.105. That is so, because ORS 163.105 does not authorize the board to take any action relating to a parole *626 release date; the board’s sole directive in that statute is to “convert the terms of the prisoner’s confinement to life imprisonment with the possibility of parole or work release.” ORS 163.105(3). It is highly doubtful that the legislature intended to leave the board without statutory authority to conduct parole hearings for aggravated murderers whose mandatory minimum sentences have been converted to indeterminate sentences and who become eligible for parole pursuant to ORS 163.105.
Finally, we find further contextual support for our interpretation of ORS 144.120(1)(a) (1991) in that there is no practical reason to have a parole hearing after one year for most aggravated murderers, who are required, under ORS 163.105, to serve at least 20 years in prison before becoming eligible for parole. Any requirement to conduct a hearing and set an initial release date after only one year would be premature.
Legislative history suggests that the legislature contemplated that practical concern when it adopted the 1991 amendment. That amendment was enacted from House Bill 2603. When the House Subcommittee on Criminal Law and Corrections met to consider that bill, Representative Rod Johnson asked the then-Chairman of the Board of Parole, Vern Faatz, the purpose of the amendment. Faatz replied:
“There are three categories for aggravated murder: aggravated murder with the death penalty (the Board has no function with that); aggravated murder without parole (the Board has no function with that); and then aggravated murder with parole. The Board has no real up front prison term setting responsibility. We have, at the end of 20 years, a requirement of a review and consideration of parole, if it’s determined the person can be rehabilitated at a future date[J”
Tape Recording, House Committee on Judiciary, Subcommittee on Criminal Law and Corrections, HB 2603, Mar 5, 1991, Tape 40, Side A (statement of Vern Faatz). That statement suggests that the legislature viewed its purpose in amending ORS 144.120(1)(a) as an acknowledgement of the fact that there was no need to conduct a parole hearing for aggravated murderers within one year of their admission to prison when *627 they would not be eligible for parole consideration for at least 20 years.[21]
Considering all of the foregoing together, we conclude that the legislature intended that ORS 144.120(1)(a) (1991) apply to juvenile aggravated murderers and required the board to conduct parole hearings for juvenile aggravated murderers. That is, although it is possible to read the phrase as excluding aggravated murderers from the parole hearing process set out in ORS 144.120, we are persuaded by context and legislative history that the disputed phrase — “with the exception of those sentenced for aggravated murder”— merely removes “those sentenced for aggravated murder” from the requirement that a parole hearing be held within one year of the prisoners’ admission to prison, and that the legislature did not intend to eliminate the board’s authority to conduct a parole hearing for them altogether.
To summarize, we find nothing in the statutes that the board has cited as authority for the JAM rules that can be read to authorize the board to require juvenile aggravated murderers to undergo an intermediate hearing process before they become eligible for parole consideration. ORS 144.120 (1989) and ORS 144.120 (1991) required parole hearings for all prisoners who are eligible for parole consideration. To the extent that JAM rules require juvenile aggravated murderers to undergo an intermediate process before they become eligible for parole consideration, they exceed the board’s rulemaking authority and are invalid, because they conflict with the statutes requiring the board to conduct a parole hearing and set an initial release date for them, unless it declines to do so under ORS 144.120(4). The Court of Appeals erred in concluding otherwise.
We turn now to the mandamus cases. A writ of mandamus may be issued “to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specifically enjoins, as a duty resulting from an *628 office, trust, or station * * ORS 34.110. As this court stated in State ex rel Dewberry v. Kulongoski, 346 Or 260, 274, 210 P3d 884 (2009), “[a] mandamus action is a special proceeding used to compel a government official to perform a legal duty.” The legal right to compel the performance of the legal duty “must be plain and complete.” Florey v. Coleman, 114 Or 1, 2, 234 P 286 (1925). That is, “no petitioner is entitled to the remedy of mandamus unless he has a clear legal right to the performance of the particular duty sought to be enforced and unless there is a plain legal duty on the part of the defendant to perform the act.” United States of America v. Cohn, 201 Or 680, 684, 272 P2d 982 (1954).
The question remaining to be answered in these mandamus cases is whether ORS 144.120(1)(a) (1989) or ORS 144.120(1)(a) (1991) imposed on the board a legal duty to conduct a parole hearing and set a parole release date for either Engweiler, or Sopher, or both of them.
Engweiler committed his crime in 1989, although he was resentenced in 1994. Engweiler always has contended that the 1989 version of ORS 144.120(1)(a) applied to his case. Below, the board contended that, on the contrary, the version in effect at Engweiler’s resentencing — the 1991 version — applied to Engweiler. In this court, however, the board has abandoned that argument, confining itself to arguing that ORS 144.110 and ORS 163.105, which apply “notwithstanding the provisions of ORS 144.120,” mandate a different procedure for aggravated murderers. As we have explained above, ORS 163.105 and ORS 144.110 are inapplicable to prisoners who are not serving mandatory minimum sentences. That leaves ORS 144.120(1)(a) (1989). To repeat, that statute provided, in part,
“For those prisoners sentenced to a term of imprisonment for life * * *, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution.”
By its plain terms, ORS 144.120(1)(a) (1989) imposed a clear statutory duty on the board to conduct a parole hearing within one year of Engweiler’s incarceration. The board did not do so. The board must now conduct a parole hearing for Engweiler under ORS 144.120.
*629 Engweiler also argues that the board must set a release date for him at that hearing. However, ORS 144.120 did not impose a similar legal duty on the board to set a release date, notwithstanding the apparent directive in ORS 144.120(1)(a) to do so — the board “shall set the release date.” The board had no “plain” legal duty to set a release date, because ORS 144.120(4) provided:
“Notwithstanding subsection (1) of this section, in the case of a prisoner whose offense included particularly violent or otherwise dangerous criminal conduct or whose offense was proceeded by two or more convictions for a Class A or Class B felony or whose record includes a diagnosis of severe emotional disturbance such as to constitute a danger to the health or safety of the community, the board may choose not to set a parole date.”
Given the existence of subsection (4), we cannot say that Engweiler has a “plain and complete” legal right to compel the board to set a release date for him. We can say, however, that the board has a legal duty under ORS 144.120 either to set a parole release date for Engweiler or to explain why it has chosen not to do so. The trial court was correct to issue a peremptory writ of mandamus, and the Court of Appeals erred in reversing and remanding with instructions to vacate it.
However, we reach a different conclusion with regard to Sopher. Sopher is entitled to a parole hearing under ORS 144.120(l)(a) (1991). That statute provides:
“For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, with the exception of those sentenced for aggravated murder, the board shall conduct the parole hearing, and shall set the release date, within one year following admission of the prisoner to the institution.”
As we have explained, the foregoing means that prisoners sentenced for aggravated murder are entitled to a parole hearing at which the board must either set a release date or explain why it has chosen not to do so. The question in Sopher’s case is when does that legal duty on the board’s part arise? In other words, does the board presently have a clear *630 legal duty to conduct a parole hearing in Sopher’s case, such that the extraordinary remedy of mandamus is warranted?
As we have explained, although Sopher was eligible for parole consideration from the time he commenced serving his sentence, the board did not have an obligation under ORS 144.120(1)(a) (1991) to conduct a parole hearing within one year after Sopher’s admission to prison, as it did for Engweiler.
Because no statute or rule directs the board to conduct a parole hearing for Sopher at any particular time, the timing of the hearing is within the board’s discretion. Accordingly, the trial court and the Court of Appeals were correct in declining to issue a peremptory writ of mandamus.[22]
In summary, we hold that the board exceeded its statutory authority when it promulgated the JAM rules, requiring juvenile aggravated murderers to undergo the intermediate review process described in ORS 163.105(2) to (4) before the board makes parole release decisions respecting them. The Court of Appeals erred in holding otherwise. Each inmate is serving an indeterminate sentence of life imprisonment with the possibility of parole. The legislature provided the board with authority in ORS 144.120(1) to determine initial release on parole for inmates serving indeterminate sentences. We also conclude that ORS 144.120(1) (1989) imposed on the board a legal duty to conduct a parole hearing immediately for Engweiler and to set an initial release date for him or explain why it chooses not to do so. As to Sopher, we hold only that ORS 144.201(1) (1991) entitles him to a hearing at some point to set an initial release date. However, as we have explained, the board has authority under the statute to determine when to hold that hearing. We conclude, therefore, that the Court of Appeals erred in reversing the trial court’s issuance of the writ of mandamus *631 in Engweiler’s mandamus action; however, we affirm the Court of Appeals decision affirming the trial court’s dismissal of Sopher’s mandamus action.
The decision of the Court of Appeals in Sopher v. Board of Parole, 233 Or App 178, 225 P3d 836 (2010) is reversed. The decision of the Court of Appeals in State ex rel Engweiler v. Powers, 232 Or App 214, 221 P3d 818 (2009) is reversed and the trial court’s issuance of the writ is affirmed. The decision of the Court of Appeals in State ex rel Sopher v. Washington, 233 Or App 228, 225 P3d 142 (2010) is affirmed in part and vacated in part.

 Throughout this opinion, we refer to inmates who committed aggravated murder when they were less than 17 years of age, collectively, as “juvenile aggravated murderers.”

 We set out the text of the pertinent statutes later in this opinion.

 As we discuss in more detail below, Engweiler has appeared before the Court of Appeals and this court multiple times since his incarceration in 1991, resulting in, as pertinent to this case, six separate judicial opinions. For convenience and for clarity, we set them all out here, with reference numbers based on their order of initial publication:
*596 1. State v. Engweiler, 118 Or App 132, 846 P2d 1163, rev den, 317 Or 486 (1993) 9Engweiler I).
2. Engweiler v. Board of Parole, 197 Or App 43, 103 P3d 1201 (2005) (Engweiler IP).
3. Engweiler v. Board of Parole, 340 Or 361, 133 P3d 910 (2006) (Engweiler IIP).
4. State ex rel Engweiler v. Cook, 340 Or 373, 133 P3d 904 (2006) (Engweiler IV).
5. Engweiler v. Board of Parole, 343 Or 536, 175 P3d 408 (2007) (Engweiler V).
6. State ex rel Engweiler v. Powers, 232 Or App 214, 221 P3d 818 (2009) (Engweiler VI).
After Engweiler filed his petition for review of the Court of Appeals decision in Engweiler VI, the Court of Appeals granted the board’s motion to amend the case caption to reflect that Aaron Felton is now the board’s chairman.

 In a second claim for relief in Sopher’s petition for writ of mandamus, Sopher alleged that the board’s application of the JAM rules, as to him, was unlawful in various respects and that the board had a nondiscretionary duty to correct the errors. The trial court mischaracterized Sopher’s argument as a contention that the hoard did not have discretion to adopt the JAM rules, and it denied relief on the ground that mandamus “will not lie to challenge the Board’s exercise of discretion.” On appeal, the board conceded that the trial court erred in dismissing Sopher’s claim on that ground, and the Court of Appeals accepted that concession. Sopher III, 233 Or App at 238. The Court of Appeals therefore reversed the trial court’s dismissal of Sopher’s second claim and remanded the case in part for reconsideration on that ground. Id. Neither Sopher nor the board addresses that issue in this court. However, because we hold that the hoard has a duty to conduct a parole release hearing on Sopher’s behalf under ORS 144.120(1)(a) (1991), and that the board exceeded its statutory authority in promulgating the JAM rules, it is unnecessary to remand this case to the board for consideration of whether the hoard incorrectly applied the JAM rules to Sopher. For that reason, we vacate that part of the Court of Appeals decision reversing the trial court’s dismissal of Sopher’s second claim and remanding that claim to the board for reconsideration.

 As pertinent here, ORS 183.400 provides:
“(1) The validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases. The court shall have jurisdiction to review the validity of the rule whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, but not when the petitioner is a party to an order or a contested case in which the validity of the rule may be determined by a court.
at. # * * *
“(3) Judicial review of a rule shall be limited to an examination of:
“(a) The rule under review;
“(b) The statutory provisions authorizing the rule; and
“(c) Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures.
“(4) The court shall declare the rule invalid only if it finds that the rule: “(a) Violates constitutional provisions;
“(b) Exceeds the statutory authority of the agency; or
“(c) Was adopted without compliance with applicable rulemaking procedures.”

 In their petitions for writs of mandamus, Engweiler and Sopher alleged, among other things, that the board failed to perform its nondiscretionary, statutory duty to conduct an initial parole release hearing and set an initial parole release date, that the board had established a parole release date for other juvenile aggravated murderers, and that the board’s failure to set an initial release date for them violated their constitutional rights in various respects.

 In 1991, the italicized sentence in ORS 144.120(1)(a) (1989), above, was amended to read as follows:
“For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, with the exception of those sentenced for aggravated murder, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution.”
Or Laws 1991, ch 126, § 6 (emphasis added).

 ORS 144.110 (1989) was identical in all material respects to ORS 144.110 (1991). For convenience, we refer at all times in this opinion to the 1989 version of ORS 144.110.

 ORS 163.105 (1989) was identical in all material respects to ORS 163.105 (1991). For convenience, we refer at all times in this opinion to the 1989 version of ORS 163.105.

 The 1989 version of ORS 161.620 is identical to the version in effect in 1991, when Sopher committed his crime. For convenience, we refer at all times in this opinion to the 1989 version of ORS 161.620.

 As discussed in note 4, above, the Court of Appeals also accepted the state’s concession that the trial court erred in dismissing Sopher’s second claim for relief and reversed in part the trial court’s ruling on that ground.
In addition, Sopher made certain other arguments in the Court of Appeals revolving around a central claim that the board’s refusal to give him a hearing under ORS 144.120(1)(a) (1991) violates various of his state and federal constitutional rights. The court rejected those arguments without extended discussion. Sopher II, 233 Or App at 180. In light of our holding that Sopher is entitled to a hearing under ORS 144.120(1)(a) (1991), we need not reach those issues.

 The board argues that that conversion of the prisoner’s sentence to life with the possibility of parole would not be pointless in the case of prisoners not serving a mandatory minimum sentence, because, in its view, a “life sentence” does not include the possibility of parole. Therefore, all prisoners serving “life sentences,” including juvenile aggravated murderers, can be required to undergo a rehabilitation hearing before becoming eligible for parole. Further, the board argues, while it is true that juvenile aggravated murderers must have the eventual possibility of parole, that does not mean that the board is precluded from requiring whatever procedure it desires, on whatever timeline, before considering juvenile aggravated murderers for parole.
We disagree. Prisoners with indeterminate sentences generally were eligible for parole consideration soon after their admission to prison. See ORS 144.120 (requiring the board to conduct parole hearings and set parole release dates for most prisoners within a year of their incarceration). And, as we observed in Janowski/Fleming, 349 Or at 449, aggravated murderers who have demonstrated that they are capable of rehabilitation and who have had their sentences converted to life with the possibility of parole are in the same position respecting parole eligibility as any other offender who was sentenced to life imprisonment by the trial court at the time of his conviction. That is, they are entitled to parole consideration at a parole hearing. Id. at 456. Juvenile aggravated murderers also serve indeterminate life sentences and, as we discuss in more detail below, they, too, are eligible for a parole hearing and parole consideration under ORS 144.120.

 The Court of Appeals reached a contrary conclusion, determining that the references to converting the terms of the prisoners’ confinement were “redundant,” *613 and concluding that accepting a measure of redundancy is preferable to “hold[ing] that some portion of a statute simply does not mean what it says.” Engweiler VI, 232 Or App at 228. The Court of Appeals erred in two respects. First, redundancy is a (perhaps unnecessary) repetition of terms; it does not refer to terms that are inapplicable to a given situation. Thus, from the point of view of juvenile aggravated murderers who are serving sentences of life imprisonment with the possibility of parole, ORS 163.105 is not redundant when it refers to the conversion of the terms of a prisoner’s confinement from a prohibition on eligibility for parole to the possibility of parole; rather, it is inapplicable. The Court of Appeals’ second error was in viewing the principal focus of ORS 163.105(2) to (4) as on “the board’s obligation to determine the offender’s rehabilitation status,” and the conversion of the terms of confinement as a “superfluity.” Id. at 229. As we discuss in the text, the words of ORS 163.105(2) to (4) belie that interpretation. Although the issue to be decided at the rehabilitation hearing is the offender’s rehabilitation, the board’s obligation is to convert the terms of the prisoner’s confinement. ORS 163.105(3) (if the board finds the prisoner to be capable of rehabilitation, the board “shall enter an order to that effect and the order shall convert the terms of the prisoner’s confinement to life imprisonment with the possibility of parole or work release”). And, as we also discuss in the text, the fact that subsection (4) refers to the prisoner’s right to petition again for a change in the terms of his confinement after two years if he is unsuccessful the first time demonstrates that the conversion of the sentence is not a superfluity; it is the purpose of the prisoner’s petition.

 The dissent disagrees with our conclusion that ORS 144.110(2)(b) and ORS 163.105 have no applicability to juvenile aggravated murderers. In the dissent’s view, ORS 144.110(2)(b) is the “only * * * statute [that] serves as the potential source for the board’s power to parole any aggravated murderer, adult or juvenile,” 350 Or at 633 (Linder, J., dissenting), because the board’s general authority to parole inmates was limited, under ORS 144.050, to inmates who committed their offenses prior to November 1, 1989. Id. at 635. Therefore, according to the dissent, to the extent that we conclude that neither ORS 144.110 nor ORS 163.105 applies to juvenile aggravated murderers, we also must conclude that the board lacks authority to parole juvenile aggravated murderers at all. Id. at 635-36.
The dissent errs in two ways. First, ORS 144.110(2)(b) is not the only “potential source for the board’s power to parole” juvenile aggravated murderers. The dissent reaches that erroneous conclusion because it reads in isolation, and therefore places too much emphasis on, one phrase in ORS 144.110(2)(b): “[t]he board shall not release a prisoner on parole * * * except’ as provided in ORS 163.105. Context establishes that the legislature did not intend that phrase as a grant of authority to the board to release any prisoner on parole. Rather, as we discuss in the text, both ORS 144.110(2)(a) and ORS 144.110(2)(b) are merely restrictions on paroling persons who have been sentenced to minimum terms. ORS 144.110(2)(a) provides that, when a trial court has imposed a mandatory minimum sentence for a felony other than aggravated murder, a majority vote of the board is required to override that mandatory minimum. In a parallel fashion, ORS 144.110(2)(b) provides that, when the trial court has imposed a 30-year mandatory minimum sentence for aggravated murder, the board must follow the procedures set out in ORS 163.105 to override that mandatory minimum.
Our conclusion that ORS 144.110(2)(b) is merely an override provision is bolstered by the fact that ORS 163.105 only addresses the conversion of a prisoner’s 30-year mandatory minimum sentence to a sentence of life imprisonment with the possibility of parole; it does not authorize or provide a mechanism for the board to release any prisoner on parole. See Janowski / Fleming, 349 Or at 446 (ORS 163.105 silent with respect to how the board was expected to determine a prisoner’s actual duration of confinement once board converted prisoner’s term to life with the possibility of parole). And, as previously stated, juvenile aggravated murderers never were sentenced to minimum terms; therefore, no override under ORS 144.110 or conversion under ORS 163.105 is necessary.
*616 The fact that ORS 144.110 is not a source of the board’s parole authority does not mean, however, that the board lacks authority to parole juvenile (or adult) aggravated murderers. It is true, as the dissent observes, that ORS 144.050 (1989) grants the board express authority to parole only those inmates who committed offenses prior to November 1, 1989. However, as we discuss in the text below, the legislative note following ORS 144.110 (enacted at the same time as the amendment to ORS 144.050 limiting the board’s parole authority to offenders who committed crimes after November 1, 1989) explicitly provides that ORS 144.110, ORS 144.120, and several other statutes, all governing the board’s authority to release prisoners on parole, continue to apply to prisoners who have been convicted of aggravated murder, regardless of the date of their crimes. That legislative note, then, effectively operates as an exception to the date limitation in ORS 144.050 on the board’s parole authority, permitting it to continue to exercise that authority over prisoners convicted of aggravated murder after November 1, 1989. In other words, notwithstanding its apparently limiting wording, ORS 144.050 continues to be the source of the board’s parole authority over aggravated murderers.

 As a preliminary matter, we acknowledge, as the board has pointed out, that this court considered, in Engweiler V, whether the board had exceeded its statutory authority in promulgating the JAM rules. In that case, Engweiler argued that the JAM rules exceed the board’s authority because they ran afoul of ORS 144.780(1) (1997), which directed the board to “adopt rules establishing ranges of duration of imprisonment to be served for felony offenses prior to release on parole.” Engweiler argued that that statute obligated the board to establish a “duration of imprisonment” at a juvenile aggravated murderer’s initial prison term hearing, but the JAM rules do not permit setting an actual parole release date at a prison term hearing. This court held that Engweiler had misread ORS 144.780; that statute required only that the board adopt “ranges” of duration of imprisonment, which it did when it adopted the exhibits attached to the rules. Engweiler V, 343 Or at 550. It did not require the board to establish a particular duration of imprisonment for any particular prisoner. Accordingly, the court held, the JAM rules did not conflict with ORS 144.780(1) (1997), and the board, therefore, did not exceed its statutory authority in any way argued by Engweiler in that case. Id. at 551 (“ORS 144.780(1) (1997) is not offended by [the] procedural choice on the board’s part [to conduct an intermediate hearing before setting a parole release date].”).
*617 In Engweiler V, this court was not asked to, and did not, address the precise issue that the court confronts today, viz., whether the board exceeded its statutory authority in adopting the JAM rules because no statute authorizes the board to require juvenile aggravated murderers to undergo an intermediate review process before the board considers them for parole eligibility and other statutes require the board to conduct parole hearings and set parole release dates for them.

 Of course, as noted above in note 15, this court held in Engweiler V that ORS 144.780 also did not operate as an impediment to the promulgation of such rules.

 We recognize that another subsection of ORS 144.120 — ORS 144.120(4)— gives the board the authority to choose not to set a parole release date for, among others, prisoners “whose offense included particularly violent or otherwise dangerous criminal conduct.” We need not decide today whether the board may invoke that subsection to choose not to set a parole release date for prisoners who committed juvenile aggravated murder, an offense that inherently “included particularly violent or otherwise dangerous criminal conduct.”

 In Engweiler III, this court reached a similar conclusion. There, the court stated that,
“under that [1991] version of ORS 144.120(1)(a) * * *, the board was not required to set an initial release date for prisoners who, like petitioner, had been sentenced to aggravated murder. * * * [N]o * * * statute required the board to set an initial release date for persons like petitioner.”
340 Or at 368-69. Those statements in Engweiler III were dicta, because Engweiler had argued that the version that was in effect when he committed his crime — the 1989 version' — was the version that applied in his case, and the board conceded that point for purposes of argument there. In summarizing ORS 144.120(1)(a) (1991) in the way that it did, this court did not analyze the context of that wording or consider its legislative history. As we explain below, we no longer agree with the court’s statement — at least as it implicitly suggests that ORS 144.120(1)(a) (1991) requires the board neither to conduct a parole hearing, nor to set a release date, for any prisoner convicted of juvenile aggravated murder. And, in light of the fact that the court’s comments are dicta, we are not bound by them-

 The board conceded Sopher’s point in this regard at oral argument in this court. That is, the board has conceded that the exclusion for aggravated murderers *623 that the legislature added to ORS 144.120(1)(a) in 1991 means only that the board need not conduct a parole hearing for aggravated murderers within one year of their admission to prison; ORS 144.120(1)(a) (1991) continued to require a parole hearing for all aggravated murderers, including juvenile aggravated murderers, at some point. In this court, the board’s only argument is that the board is required to conduct a rehabilitation hearing for all aggravated murderers, including all juvenile aggravated murderers, under ORS 163.105 before conducting the parole hearing required by ORS 144.120(1)(a).

 ORS 144.120 (1991) provided:
“(1)(a) Within six months of the admission of a prisoner to any Department of Corrections institution, with the exception of those prisoners sentenced to a term of imprisonment for life or for more than five years, the board shall conduct a parole hearing to interview the prisoner and set the initial date of release on parole pursuant to subsection (2) of this section. For those prisoners sentenced to a term of imprisonment for more than five years but less than 15 years, the board shall conduct the parole hearing and set the initial date of release within eight months following admission of the prisoner to the institution. For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, with the exception of those sentenced for aggravated murder, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution. Release shall be contingent upon satisfaction of the requirements of ORS 144.125.
“(b) Those prisoners sentenced to a term of imprisonment for less than 15 years for commission of an offense designated by rule by the board as a non person-to-person offense may waive their rights to the parole hearing. When a prisoner waives the parole hearing, the initial date of release on parole may be set administratively by the board pursuant to subsections (2) to (6) of this section. If the board is not satisfied that the waiver was made knowingly or intelligently or if it believes more information is necessary before making its decision, it may order a hearing.
“(2) In setting the initial parole release date for a prisoner pursuant to subsection (1) of this section, the board shall apply the appropriate range established pursuant to ORS 144.780. Variations from the range shall be in accordance with ORS 144.785.
“(3) In setting the initial parole release date for a prisoner pursuant to subsection (1) of this section, the board shall consider the presentence investigation report specified in [former] ORS 144.790 or, if no such report has been prepared, a report of similar content prepared by the Department of Corrections.
“(4) Notwithstanding subsection (1) of this section, in the case of a prisoner whose offense included particularly violent or otherwise dangerous criminal conduct or whose offense was preceded by two or more convictions for a Class A or Class B felony or whose record includes a psychiatric or psychological diagnosis of severe emotional disturbance such as to constitute a danger to the health or safety of the community, the board may choose not to set a parole date.
“(5) After the expiration of six months after the admission of the prisoner to any Department of Corrections institution, the board may defer setting the initial parole release date for the prisoner for a period not to exceed 90 additional days pending receipt of psychiatric or psychological reports, criminal records or other information essential to formulating the release decision.
“(6) When the board has set the initial parole release date for a prisoner, it shall inform the sentencing court of the date.
“(7) The State Board of Parole and Post-Prison Supervision must attempt to notify the victim, if the victim requests to be notified and furnishes the board a current address, and the district attorney of the committing county at least *625 30 days before all hearings by sending written notice to the current addresses of both. The victim, personally or by counsel, and the district attorney from the committing jurisdiction shall have the right to appear at any hearing or, in their discretion, to submit a written statement adequately and reasonably expressing any views concerning the crime and the person responsible. The victim and the district attorney shall be given access to the information that the board or division will rely upon and shall be given adequate time to rebut the information. Both the victim and the district attorney may present information or evidence at any hearing, subject to such reasonable rules as may be imposed by the officers conducting the hearing. For the purpose of this subsection, ‘victim’ includes the actual victim, a representative selected by the victim, the victim’s next of kin.”

 It is notable that juvenile aggravated murderers were not mentioned in the hearing, and the legislature apparently did not consider the possibility that ORS 163.105 did not apply to juveniles or that, under ORS 161.620, juvenile aggravated murderers were eligible for parole consideration immediately upon admission to prison.

 In light of our decision, it is, however, appropriate to ask: Where does that leave inmate Sopher? Given that Sopher has been eligible for parole consideration from the time he began serving his sentence, his situation is more like Engweiler’s than like the adult aggravated murderers who must wait at least 20 years before becoming eligible for parole consideration. Because almost 20 years already has elapsed since Sopher began serving the sentence for his crime, the board should consider conducting a parole hearing consistent with ORS 144.120(1)(a) (1991), and either set a release date for Sopher or explain why it has chosen not to do so.